GARY M. RESTAINO
United States Attorney
District of Arizona
ERICA L. SEGER
Assistant U.S. Attorney
State Bar No. 022681
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: erica.seger@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 20-00678-TUC-JCH (DTF) |
| Plaintiff, | |
| vs. | UNITED STATES' SENTENCING MEMO |
| Sara Belen Coltz, | |
| Defendant. | |

Plaintiff, the United States of America, by and through its attorneys respectfully submits its sentencing memorandum in the above-captioned matter. The sentencing hearing is currently scheduled for January 13, 2022.

On September 14, 2021, the defendant pleaded guilty to Count 2 of the Indictment, which charges the defendant with Coercion and Enticement of a Minor, a felony, in violation of Title 18 U.S.C. § 2422(b) with a plea agreement. Based on the findings of the pre-sentence report, the defendant has three criminal history points and therefore, is in criminal history category II. (PSR ¶ 41.) The correctly calculated guideline range yields a range of 235 to 293 months. (PSR ¶ 81.) The plea agreement reduces this range to 120-264 months.[1]  The pre-sentence report recommends a sentence of 120 months

---

[1] The plea agreement between the parties caps the maximum sentence at "no higher than the middle of the correctly calculated guideline range." The intent of the parties was for the sentencing range to be between 120 months and 264 months.

imprisonment to be followed by lifetime supervised release. (PSR pg. 19.) The United States requests a sentence of 180 months to be followed by lifetime supervised release.

## I. FACTS RELEVANT TO SENTENCING

On June 22, 2018, Tucson Police Department (TPD) made contact with Paula Carter and her son, Allan Carter. Paula stated that she has adoptive custody of her grandson, the victim in this case. The victim is the biological son of the defendant. Paula told officers the victim told her that the defendant had been sending him sexually explicit images through Facebook messenger. The victim also indicated he had sent a picture of his penis back to his mother. The victim's father, Allan, stated the victim told him that he had a fake Facebook account where he was exchanging sexual messages with multiple people and gave his father access to the account.

When Allan looked at the account, he observed multiple conversations with varying people about having sexual intercourse with the victim and other children. Allan also saw messages from the defendant. In those messages, she sent multiple nude photographs with her face visible in them. The defendant also specifically stated that she wanted to have sexual intercourse with the victim in the messages; TPD officers also observed the messages Allan was talking about. Allan also showed TPD messages from a female in Los Angeles who sent a nude photo of herself masturbating to the victim, messages from a group chat where the members were posting photos of various children stating that they wanted to arrange for sexual meetings with the minors.

During a forensic interview, the victim stated he used Facebook Messenger, to talk to his mom. He said his mother wanted to have sex with him and sent dirty pictures of herself to him. She asked him to send dirty pictures of himself to her, so he did. According to the victim, the defendant brought up the dirty stuff and asked for pictures of himself. He said he saw her vagina and breasts and you could see her face as well in some photos and she sent a lot of pictures. He would ask her to send a picture of her to see how she looked and she would send a dirty one. When asked what kind of pictures he would send her, he didn't want to say it out loud with the interviewer and wrote on a piece of paper "can you

send me a pie of your dick." Further, there was another person, Rose Stone, his mom introduced him to that would send pictures to him. The victim indicated his mom would use the excuse that she was on drugs and didn't remember anything. The defendant also asked the victim to video chat two times a week. The video chats were usually sexual and she would finger herself and he would jackoff. She would tell him to "spit on his dick and then jackoff."

Throughout the charged time period, there are numerous discussions between the victim and the defendant about engaging in sexual activity. Below are a few examples:

Apr 09, 2018 7:48am
Sara Belen
I would lay you on your back and suck your dick.get it all wet and then slide my wet tight dripping pussy down on that dick and start bouncing up and down and riding it ti! I start draingninb all over your balls. As I came all over you.

Apr 17, 2018 8:05pm
Sara Belen
I would get down on my knee and suck your cock ti! you blew a load in the back ofmy throat! Or you could pull my skirt up .. bend me over and give it to me like a bad girl deserves and smack that ass .. leave a hand print!!

Apr 17, 2018 8:10am
Carter King
wat would u do to me

Apr 17, 2018 8:01am
Carter King
ok thx

Apr 17, 2018 7:59am
Sara Belen
Erase them after your done

Apr 17, 2018 7:59am
Carter King
y

Apr 17, 2018 7:58am
Sara Belen

| | |
|---|---|
| 1 | Not a naughty ones ... |
| 2 | Apr 17, 2018 7:58am |
| 3 | Carter King |
|   | do u got any pies ofu that i could see? |
| 4 | |
| 5 | Here is an example in May: |
| 6 | Sara Belen |
| 7 | Not in the ass but you Have to be gentle af. Okay. Gentle and slow. Let me do the mounting. |
| 8 | May 05, 2018 2:33pm |
|   | Carter King |
| 9 | ? |
| 10 | |
| 11 | May 05, 2018 2:31pm |
|    | Carter King |
| 12 | do i still have to wear a condom in the ass |
| 13 | May 05, 2018 2:30pm |
| 14 | Carter King |
|    | i love u |
| 15 | |
| 16 | May 05, 2018 2:29pm |
|    | Carter King |
| 17 | ok |
| 18 | |
| 19 | May 05, 2018 2:29pm |
|    | Sara Belen |
| 20 | Make sure to delete lovebug. |
| 21 | May 05, 2018 2:29pm |
|    | Carter King |
| 22 | ? |
| 23 | |
| 24 | May 05, 2018 2:29pm |
|    | Carter King |
| 25 | oh yeahhh |
| 26 | May 05, 2018 2:29pm |
| 27 | Sara Belen |
|    | ? |
| 28 | |

May 05, 2018 2:28pm
Sara Belen
I will get on my knees and play with them with my mouth and then bounce up and down .. then you lift my skirt to fuck me in my ass.

May 05, 2018 2:28pm
Carter King
?

On June 11, 2018, the defendant sent the victima collage of 5 pictures. One is a face shot of the defendant, the next three are of her exposing her naked breasts and the last appears to be the defendant naked from the waist down bending over manipulating her anus with her hand.

In reviewing the chat messages from one of the victim's account extractions, there were a few group chats called Open Minded Mamas and Open minded Mamaz. Participants were the defendant, Jennifer Charette, Rose Stone and the victim. In these chats, there are numerous images and videos sent from the victim to the group of a male's penis and a male starting to masturbate with his left hand and a video sent from the victim to the group of a male masturbating.

**II.    SENTENCING RECOMMENDATION**

The United States respectfully recommends a 180-month sentence to be followed by a lifetime of supervised release. The sentencing objectives set forth by Congress in § 3553(a) are best accomplished through a substantial prison sentence. Although other factors may apply, the most significant with regard to the defendant are the nature and circumstances of the offense, the seriousness of the offense, and the need to protect vulnerable children from further sexual exploitation and deter other pedophiles.

**A.    Nature and Circumstances of the Offense**

The defendant's criminal conduct is extremely serious and demands an appropriately stringent sentence. On its face, the coercion of a minor for the purposes of producing of child pornography is a serious offense because "child pornography is a permanent record of the depicted child's abuse." *United States v. Paroline*, 572 U.S. 434

(2014). "The unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse . . . plays a part in sustaining and aggravating this tragedy." *Id*. at 457. The Supreme Court has emphasized that child pornography offenses are serious crimes deserving of a need "to impress upon offenders that their conduct produces concrete and devastating harms for real, identifiable victims."

But this is so much more than the typical enticement/child sex abuse material (CSAM) case. The defendant's actions caused incalculable harm. The defendant is the mother of the victim and harmed her child in a manner that seems unfathomable. She took away aspects of his childhood and his freedom from the kind of nightmares and memories that most others will never know. *See id*. at 441. In other words, not being adequately protected by your mother, knowing that your mother chose not to protect you and knowing that your mother actively victimized you are three distinctly different harms.

As the victim continues in life and continues to have problems commensurate with the ACE studies discussed below, we might never know whether the problems are traceable to his mother's sexual abuse. Indeed, the victim will likely spend the rest of his life in and out of therapy trying to sort out the complicated emotions resulting from the defendant's actions. Learning that one of your parents is not your protector is a devastating life experience for a child that will reverberate throughout the rest of your life.

It is difficult to overstate how psychologically damaging the defendant's actions were, and how they will continue to reverberate throughout this child's life. As the Supreme Court emphasized, such cases demonstrate "the need to impress upon defendants that their acts are not irrelevant or victimless."

**B.      Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment**

Any crime against a child is in a category of the most serious crimes. It is critically important, in looking at this case, to keep in mind two important points. First, any child exploitation offense, even "mere" possession, is of a different order of magnitude than the majority of crimes encountered in federal court, and thus should be sentenced accordingly.

Second, this case in particular, when viewed on a more granular level, is itself a different order of magnitude from the typical CSAM case due to the defendant's relationship to the victim and her callous indifference to the child's wellbeing. As a consequence of being a victim of child sexual abuse, the victim is now at an increased risk of falling prey to alcohol abuse, illicit drug use, sexual promiscuity, and suicide. Research in this area is startling and demonstrates the need for a significant punishment.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal abuse, physical abuse, sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995 through 1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009). In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and the long-term health and social problems. See Molnar, B. E., Berkman, L. F., & Buka, S. L. (2001). Psychopathology, childhood sexual abuse

and other childhood adversities: Relative links to subsequent suicidal behaviour in the US. *Psychological Medicine, 31*, 965-977. "Among those sexually abused as children, odds of suicide attempts were 2-4 times higher among women and 4-11 times higher among men, compared with those not abused, controlling for other adversities." *Id.* at pg. 965. "Child sexual abuse is an important risk factor for both psychopathology and suicidal behaviour. A review of 29 studies conducted between 1988-1998 estimated the odds of suicide attempts among adults sexually abused in childhood to be 1-3 to 25-6 higher than for those not sexually abused. Most major psychiatric disorders have been linked to child sexual abuse, especially depression, posttraumatic stress disorder and substance problems and dependence." *Id.* at pg. 966.

Another analysis of the same data looked the impact of sexual exploitation on the internet. *See* Wells, M., & Mitchell, K. J. (2007). Youth sexual exploitation on the internet: DSM-IV diagnoses and gender differences in co-occurring mental health issues. *Child and Adolescent Social Work Journal, 24*(3), 235-260. "A greater percentage of youth victims of online sexual exploitation had current and lifetime posttraumatic stress disorders. […] This finding suggests that youth victims of Internet-related sexual exploitation have some of the same mental health characteristics as traditional sexual abuse victims. However, only a minority of youth victims had a current or lifetime diagnosis of post-traumatic stress. Further, these victims had a diversity of other types of diagnoses, speaking to the diverse nature of online sexual exploitation victims." (*Id.* at pg. 256.) "Mental health professionals reported that female and male youth clients experience some, but not all of the same mental health issues. Both male and female victims of online sexual exploitation were more likely to experience running away from home, acting out sexually, and sexual victimization. […] Similarly, these victims may have run away in order to connect with offenders met online, or may have run away for other reasons. Both male and female youth clients appear to exhibit both internalizing and externalizing problems. This is true for online sexual exploitation victims as well as youth experiencing other types of Internet-related problems." (*Id.* at pg. 256.)

Section 3553(a)(2)(A) instructs this Court to fashion a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide *just punishment* for the offense." (emphasis added). The scientific articles discussed above very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse.

Furthermore, this abuse happened in the victim's own home where he was supposed to be protected. The defendant breached the safety of the victim's home by her conduct and exploitation of the victim. The victim is now at a significantly increased risk of attempting suicide, using illicit drugs, and having alcohol problems. In fact, he's not just at risk, he has already demonstrated increased anger issues and has already acted out inappropriately sexually. (PSR ¶ 18.) Further, there is an increased chance that he will die nearly 20 years early. In short, the defendant, by using the victim as a sexual object for her own base gratification, has forever impacted her child in ways that have significant long-term health consequences.

There is no telling what damage she has ultimately caused, and whether the victim will ever be able to live a productive, healthy life. A significant sentence of imprisonment would therefore be both reasonable and appropriate—"just punishment" in the terms of § 3553(a)—given the lifelong consequences that the victim will likely experience due to his own mother's reprehensible acts.

**C.     Adequate Deterrence & Protect the Public**

Both specific and general deterrence call for a significant sentence in this case to send a message that sexually victimized your own child will result in a federal prison term that is consequential.

In a study published in the journal *Child Abuse & Neglect*, researchers explained the impact that various factors had on the consequences suffered by a child sexual abuse survivor, concluding that "[t]he present data further show a link between perceived social support from parents, externalizing behaviors and global self-worth . . . in finding that behavioral difficulties are less intense and the evaluation of self-worth more positive when

the child feels supported by his parents."[2] The study examined 50 sexually abused children between the ages of 7 and 12. The results revealed that abuse-related characteristics, such as the duration, severity, and perpetrator identity, can all be modulated by the support they receive from the parent who did not sexually abuse them.

Of the three abuse-related characteristics, the identity of the perpetrator was the best correlated factor of whether the child experienced internalizing psychological symptoms. In other words, "children who were abused by a close adult (for example in the immediate or extended family) tended to manifest more anxiety, depression, somatic complaints and withdrawal symptoms compared to victims assaulted by a more distant perpetrator (outside the family or stranger)."[3] This makes sense because the *betrayal* of a mother who uses you as a sexual object is arguably worse than the sexual abuse itself (severity and duration).

With this research in mind, this Court should impose a sentence that addresses the general deterrence issue of making it clear to parents in the community that victimizing your child is an incredibly serious crime. A significant sentence for coercing your child to engage in sexual acts can serve the general deterrence goals of making clear to anyone in the community that this conduct is always the wrong decision and carries with it grave consequences.

### D.    Need to Avoid Unwarranted Sentencing Disparities

This Court has no doubt encountered cases involving the coercion and enticement of a minor resulting in the production of CSAM. But this one is far outside the "typical" case. This case involves so many more aggravating facts, that any comparison to cases charging the same statute would be meaningless. However, the United States recommends that this Court recognize that the Guidelines recommend a range that is significantly higher than the United States' request. Accordingly, any sentence, to avoid disparity, should

---

[2] Tremblay, C., Hebert, M., & Piche, C. (1999). Coping strategies and social support as mediators of consequences in child sexual abuse victims. *Child Abuse & Neglect, 23,* 929-945, at 936.

[3] *Id*. at 940.

account for the significant aggravating facts of this case and the nature of the underlying conduct.

### E.  Lifetime supervised release is reasonable and appropriate

Regardless of the term of imprisonment, this Court should impose a term of supervised release that extends for the life of the defendant. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. *See United States v. Granderson*, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in prison. *See United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term recommendation contained in Section 5D1.2(b) is evidence that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders); *see also supra* (discussing defendants over the age of 60 who have committed similar federal child exploitation crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 684.

Here, lifetime supervision is necessary to protect the community. While we might all hope that the defendant will have learned from this case, this Court should nevertheless impose lifetime supervised release to make certain that any contact with minors and any

internet usage is closely monitored. Therefore, a term of supervised release for life is reasonable and appropriate in this case to achieve rehabilitative ends and to protect children from further victimization.

### III. CONCLUSION

WHEREFORE, for the reasons stated herein, the government respectfully requests that the Court impose a sentence of 180 months' imprisonment followed by a lifetime of supervised release.

**RESPECTFULLY SUBMITTED** on this 6th day of January, 2022.

>GARY M. RESTAINO
>United States Attorney
>District of Arizona
>
>*s/ Erica L. Seger*
>
>Erica L. Seger
>Assistant United States Attorney

Copy of the foregoing served electronically or by other means this 6th day of January, 2022, to:

All ECF participants